Howell, Judge,
delivered the opinion of the court:
This is a suit by a citizen of the United States who entered into an employment agreement to serve with the Veterans’ Administration Regional Office at Manila, Philippine Islands. His petition is for payment of certain foreign living allowances because of his assignment at that post. Executive regulations described in the findings of fact, and incorporated herein by reference, deprived plaintiff of these allowances. The amount in dispute here is substantially in agreement, and the question is whether or not plaintiff is entitled to this sum under the law and regulations.
The plaintiff, a native of the Philippine Islands, lived there until he was about 20 years of age. He came to the United States in March of 1926, served in the United States Navy during World War II and, while so serving, became a naturalized citizen. After being released from military service he was employed by the General Accounting Office in Washington, D. C. Pursuant to his request and effective March 13, 1946, he was appointed as a war service indefinite employee by transfer to a position as Clerk, CAF-4, at a salary of $2,100 per annum in the Veterans’ Administration Regional Office, Manila, Philippine Islands: Travel orders were eventually issued to plaintiff and his wife which set forth his salary and stated that it was “plus 25% differential.” He reported for duty in Manila on April 18, 1946, *220 and received the 25% salary differential on his base pay (which had been increased to $2,394 on July 1, 1946) until July 14, 1946, on which date the differential payment was discontinued. Plaintiff subsequently filed a claim with the Comptroller General and was allowed the differential from July 14 to November 2, 1946, at which time 25% differentials were discontinued for all employees.
Living allowances payable to certain government officers and employees stationed in foreign countries were authorized under the provisions of 46 Stat. 818, Title 5 U. S. C., Sec. 118 (a) and in regulations of the Executive Office of the President, which were embodied in Bureau of the Budget Circular No. A-8, as amended. All of the pertinent regulations are set forth in the findings and it is unnecessary to repeat them here.
The government resists plaintiff’s claim for payment of a special foreign living allowance from November 3, 1946, to May 31, 1947, and of quarters and living allowances from June 1, 1947, to January 25, 1948, the date of his departure from foreign assignment, on the grounds that the Administrator of Veterans Affairs, pursuant to authority granted to him in revised Circular No. A-8, properly excluded plaintiff from these benefits. The Administrator undoubtedly was required to exercise his discretion in determining whether or not an individual employee fell within one of the groups of employees specifically excluded from differential payments under the Circular No. A-8. The Circular excluded among others, “ (b) noncitizens of the United States, and (c) employees who may be determined by the head of the department concerned to be ineligible for cost of living allowances because no higher costs for subsistence, service, commodities and other living expenses, except quarters (including heat, fuel, and light) are occasioned by their assignments in a foreign country.” There is no evidence in the record that a determination was made by the Administrator of Veterans’ Affairs or anyone acting in his behalf that the plaintiff was ineligible for living and quarters allowances because no extra or higher costs were occasioned by the plaintiff’s assignment at Manila.
*221 Plainly, the Administrator was properly concerned with the fact that some employees in the Philippines had always lived there and that they should not receive an extra allowance for living expenses in the country where they had always maintained their home. In this group were native Filipinos and native Americans. The officials of the Veterans’ Administration wisely concluded, we think, that the 25% differential should not be payable to permanent residents of the Philippines and further that American citizenship would be one of the requirements for a person to obtain the allowance differential. But, it was also concluded that any native-born Filipino should be excluded whether or not he was a citizen of the United States and whether or not he was a permanent resident of the Philippines.
The Administrator in the letter quoted in our Finding 12 says:
* * * This allowance was adopted for the purpose of compensating employees who leave, or remain away from, their native land, or who leave or remain away from their land of permanent residence and do not return to work in their native land, for the inconvenience and additional expense incurred by virtue of their employment in a foreign area. Under these circumstances, it is not possible to authorize payment of the allowance to natives or permanent residents of the Philippine Islands.,
As a result of this position taken by the Administrator there arose a discrimination between citizens of the United States which adversely affected the plaintiff. Plaintiff was a citizen of the United States, residing in the United States, who had left his land of permanent residence with every intention of returning, according to the evidence, in order to accept employment abroad with its attendant inconvenience and additional expense. The mere fact that in his youth he had lived in the Philippines did not cause his expenses to be any less than those of other Americans engaged in similar foreign service. At least there is no evidence that the Administrator found to the contrary and for this reason applied the prohibitions of the regulation as set forth in Circular No. A-8.
*222 Effective November 3, 1946, the Administrator of Veterans’ Affairs established a special foreign living allowance in lien of the 25% differential on base pay, as set forth in the terms of a regulation quoted in Finding 8. In this action the Administrator sought to bar natives of the Philippine Islands, stating that allowances would be those established under Circular No. A-8. The plaintiff was a native of the Philippines but a citizen of the United States, and one of the requirements of the November 3, 1946, regulation was citizenship, another was that an employee must not be a permanent resident of the Philippines, and further that compensation must be made in accordance with the Classification Act of 1923, 42 Stat. 1488, as amended by Public Law 293, 79th Congress, 1st Session, 59 Stat. 675. Plaintiff obviously met these tests of eligibility.
The defendant says the fact that the Administrator was precluded by law and regulation from granting allowances to excluded groups of employees did not require that he authorize and approve allowances for all other classes or individuals and that the power to authorize and approve allowances was a discretionary power. With this we agree, but when in the exercise of his discretion the Administrator determined the tests of eligibility he should have applied them with an even hand, otherwise his action would constitute an arbitrary, capricious exercise of authority. In Gadsden v. United States, 111 C. Cls. 487, 490, we said:
In innumerable cases it has been held that where discretion is conferred on an administrative officer to render a decision, this decision must be honestly rendered, and that if it is arbitrary or capricious, or rendered in bad faith, the courts have power to review it and set it aside.
Defendant further urges that there is no requirement that the Administrator authorize allowances for every citizen because some were paid the allowance, for the reason that payment would have been required to have been made to permanent residents as well as temporary inhabitants. With this we also agree but we do not understand that payment in this instance was required on the basis of citizenship alone.
Finally the defendant says that plaintiff elected to remain in the employ of the Veterans’ Administration in Manila until he could be transferred to some other position in Wash *223 ington, D. C., and that his acceptance of the compensation of his position, knowing that the foreign living allowances were not to be paid him, bars his recovery. The defendant indicates that plaintiff carefully refrained from relinquishing his position until he could be assured of a position in the United States. We do not believe that these inferences can properly be drawn from the evidence before the court. This evidence shows that on August 6, 1946, plaintiff did request a transfer to Washington or to some other position in the United States, and that similar requests were made on February 3 and again on March 19,1947. So anxious was plaintiff to get back to his home in the United States that on November 3,1947, he made a request to return notwithstanding the fact that his application for transfer had not then been granted. In connection with these requests, plaintiff consistently maintained that the loss of his differential pay constituted a substantial hardship to him and his wife. He pointed out that due to his long absence from the Philippines as a student and gainfully employed naturalized citizen in the United States he was practically a stranger in a strange land and like any other citizen of the United States who found himself under the same circumstances, hard put to adjust to the inflationary prices which he was called upon to meet in the Philippines. Obviously, when the plaintiff was deprived of his differential and cost of living allowances, especially when it became obvious that they would not be restored to him, he was anxious to get back to the country of his adoption and eventually he was able to do so with the defendant’s cooperation and assistance. He was given a position in the central Veterans’ Administration office in Washington in a lower Civil Service classification but at the same salary.
The plaintiff was not only a victim of circumstances but of an arbitrary ruling on the part of the Administrator of Veterans Affairs. One of the inducements for him to accept the position in the country of his birth was undoubtedly the defendant’s assurances that he would receive the 25% increase as differential pay for service in a foreign land. After he had assumed his position in this new location the defendant in effect changed the rules in the middle of the game.
*224 It is our opinion that the plaintiff is entitled to recover the sum of $2,905.72 computed as follows:
Special foreign living allowance from November 3, 1946, to May 31, 1947 (date on which such allowance was discontinued; see finding 11), at $2,520 per annum_$1,446.41
Quarters allowance from June 1, 1947, to January 25, 1948 (date of departure from Philippines), at $900 per annum_ 741.25
Cost of living allowance from June 1, 1947, to January 25, 1948 (date of departure from Philippines), at $1,100 per annum_ 718. 06
$2, 905.72
It is so ordered.
MaddeN, Judge; Whitaker, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, as follows:
1. The plaintiff is a native of the Philippine Islands.
2. In March of 1926, the plaintiff came to the United States, and he resided in Washington, D. C., for about twenty years. He served in the U. S. Navy during World War II, and while so serving, became a naturalized citizen of the United States. After his release from the naval service in 1945, he was employed by the General Accounting Office in Washington, D. C.
3. Upon advice that the Manila Regional Office of the Veterans’ Administration was being expanded, the plaintiff applied for a position in that agency. Pursuant to his request and effective March 13, 1946, the plaintiff was appointed as a war service indefinite employee by transfer from the General Accounting Office to a position as Clerk, CAF-4, at a salary of $2,100 per annum in the Veterans’ Administration Regional Office, Manila, P. I. For a brief period he remained in the Central Office at Washington, D. C., pending transfer. On March 22, 1946, the Veterans’ Administration advised plaintiff that his official station was changed to Manila effective March 31, 1946, and issued *225 travel orders for himself and his wife and up to 500 pounds of personal belongings, at an estimated cost of $1,376.97. The travel orders recited that plaintiff’s salary was $2,100 per annum plus 25% differential.
4. Plaintiff reported for duty at the Veterans’ Administration Eegional Office in Manila on April 18, 1946. As of July 1, 1946, his salary was increased from $2,100 to $2,394 per annum plus the 25% differential. Under date of July 8,1946, the Administrator of Veterans’ Affairs by radiogram instructed the Manager of the Manila Eegional Office as follows:
REURLET JUNE 18 CONCERNING FILIPINOS WHO RECEIVE CIVIL SERVICE SALARIES AND 25% DIFFERENTIAL, EFFECTIVE JULY 14, 1946, THE 25% DIFFERENTIAL WILL BE PAID ONLY TO EMPLOYEES WHO ARE UNITED STATES CITIZENS SENT TO THE PHILIPPINES FROM THE UNITED STATES OR WHO ARE DISCHARGED FROM THE UNITED STATES ARMED FORCES TO ACCEPT EMPLOYMENT IN THE PHILIPPINES, PROVIDED SUCH DIFFERENTIAL WHL NOT REPEAT NOT BE PAID TO NATIVE OF PHILIPPINES OR TO PERMANENT RESIDENT OF PHILIPPINES. STUDY BEING MADE TO DETERMINE WHETHER SYSTEM FOR PAYING ALLOWANCES SHOULD BE CHANGED. LOCAL RATE SALARY PAYMENTS TO FILIPINOS WILL BE GOVERNED BY LETTER OF FEBRUARY 5, 1940, AND SUBSEQUENT MODIFICATIONS.
By radiogram of July 25,1946, the Administrator further instructed the Manager of the Manila Office as follows:
REUKAD JULY 10 QUESTIONABLE CASES RE ENTITLEMENT DIFFERENTIAL ALLOWANCE SHOULD BE SENT CENTRAL OFFICE AIR MAIL WITH YOUR RECOMMENDATIONS. TERM NATIVE OF PHILIPPINES INCLUDES NATIVE BORN FILIPINOS WHO BECAME NATURALIZED AMERICAN CITIZENS WHETHER HIRED IN THE U. S. OR LOCALLY. TWO U. S. CITIZENS TRANSFERRED FROM CIVILIAN STATUS IN WAR DEPARTMENT LOCALLY WILL RECEIVE DIFFERENTIAL, UNLESS THEY ARE PERMANENT RESIDENTS. RE ONE AMERICAN CITIZEN WHO CAME TO PHILIPPINES THREE MONTHS AGO THEN HIRED BY V. A. SUBMIT COMPLETE DETAILS OF CASE WITH RECOMMENDATION AIR MAIL. CITIZEN OR NONCITIZEN FILIPINOS SENT TO MANILA FROM U. S. MAY BE GIVEN OPPORTUNITY TO RETURN TO U. S. WHEN DIFFERENTIAL DISCONTINUED. SHOULD EXPLAIN TO THEM DIFFERENTIAL DISCONTINUED BECAUSE ITS PURPOSE TO COMPENSATE PEOPLE FOR LEAVING NATIVE LAND, WHILE THEY RETURNED TO NATIVE COUNTRY. YOUR REQUEST GRANTED THAT ELIMINATION OF 25 PERCENT *226 DIFFERENTIAL BE DELATED TWO WEEKS UNTIL PERSONNEL FORMS ARE COMPLETED. AMERICAN CITIZENS ARE NOT TO BE EMPLOTED AT LOCAL PAT SCALE UNLESS THET ARE NATIVES OF PHILIPPINES. AS ADVISED IN RADIO OF JULT 8 ADOPTION OF COST OF LIVING ALLOWANCE USED BT STATE DEPARTMENT BEING CONSIDERED.
Although the 25% differential was discontinued as of July 14, 1946, plaintiff subsequently filed a claim with the Comptroller General and was allowed and paid the differential in the sum of $184.08 from July 14 to November 2,1946, at which time 25% differentials were discontinued for all employees.
5. Allowances payable to Federal officers and employees stationed in foreign countries were authorized by regulations of the Executive Office of the President, Bureau of the Budget, and embodied in a basic Budget Circular No. A-8 dated August 1,1943, which is incorporated herein by reference, and provided in part:
13. Scope of these regulations. — These regulations shall govern all payments of or allowances for quarters and living expenses to the following employees assigned to a foreign post or to the Philippine Islands for one year or less or for the duration of the war, except as excluded herein, and except as may be otherwise required by statute.
$ ‡ ‡ $ $
b. The following employees are excluded:
ifc Hí ❖ ❖
(3) Nationals of the same country as the foreign post to which they are assigned.
(4) Employees who may be determined by the head of the department or establishment concerned or by his designate, to be ineligible for living and quarters allowances because no extra or higher costs for quarters, subsistence, etc., are occasioned by an assignment in a foreign country. (Effective May 7, 1943)
14. Allowances authorized. — An employee whose official headquarters is located at a foreign post, with the exceptions specified in paragraph 13 hereof, shall receive a living and quarters allowance which shall be specifically authorized or approved in accordance with these regmations by the head of the department or establishment concerned or by such official as he may designate.
*227 Circular No. A-8, as revised July 19, 1946, provided in part as follows:
12. Scope of these regulations. — When authorized or approved by the head of the department, cost of living allowances are payable to employees who are being furnished quarters or receiving allowances in lieu thereof under Part A of this Circular and who are stationed at foreign posts for which cost of living allowances are provided (Appendix IV). '
The following employees are excluded: (a) Personnel of the Foreign Service of the United States; (b) non-citizens of the United States; and (c) employees who may be determined by the head of the department concerned to be ineligible for cost of living allowances because no higher costs for subsistence, services, commodities, and other living expenses, except quarters (including heat, fuel, and light) are occasioned by their assignments in a foreign country.
Appendix V of Circular No. A-8, as revised, further provided:
SPECIAL FOREIGN LIVING ALLOWANCES
The Secretary of State has established the following special foreign living allowances pursuant to paragraph 13 of Bureau of the Budget Circular No. A-8.
Special foreign living allowances shall be paid, in lieu of all other allowances under Circular No. A-8, effective the first pay period beginning after June 30, 1946, and for the locations indicated below. The head of the department shall, in addition to the deductions prescribed herein, make such other deductions in the special maximum allowances as warranted.
* # * * *
Under Appendix V, employees in the Philippines below CAF-9 could be paid a special maximum living allowance of $2,520 per annum with dependents and $1,980 without dependents.
6. There is no evidence in the record that a determination was made by the Administrator of the Veterans’ Administration or anyone on his behalf that the plaintiff was ineligible for living and quarters allowances because no extra or higher costs for quarters, subsistence, etc., were occasioned by the plaintiff’s assignment at Manila.
*228 7. About June or July of 1946, there was some concern in the Central Office of the Veterans’ Administration as to whether the 25% differential in pay was being paid properly to the employees of the Manila office because all employees at that time were receiving the 25% differential. The matters considered by the authorities in the Veterans’ Administration are shown below. First it was considered that as to those who were living in the Philippines who had always lived there, the law intended that they should not have an extra allowance for living where they had maintained their home. In this group were native Filipinos and native Americans. Some of the native Americans had lived in the Philippines all their lives and were American citizens. Some of them had never been away from the Philippines. On the other hand, some of the native Filipinos had lived in the United States for a good many years and had returned to the Philippines. All of the native Americans were citizens of the United States, but some of the native Filipinos were citizens of the United States and some were not.
It was concluded by the officials of the Veterans’ Administration that the 25% differential should not be payable to permanent residents of the Philippines, and that American citizenship would be one of the requirements for a person to obtain the differential. It was further concluded that native Filipinos should be excluded from receiving the differential regardless of whether or not they were citizens of the United States, because apparently the officials of the Veterans’ Administration didn’t feel that native Filipinos who were citizens of the United States should receive the differential while native Americans who were permanent residents of the Philippines would not be eligible to receive it.
8. Effective November 3, 1946, the Administrator of Veterans’ Affairs established a special foreign living allowance, in lieu of the 25% differential on base pay, under regulations which in part provided:
Eligibility requirements: To be eligible for the special foreign living allowance, an employee of the VA in the Philippine Islands—
a. Must be a citizen of the United States.
b. Must be compensated in accordance with the Classification Act of 1923, as amended, or Public Law 293, 79th Congress.
*229 c. Must not be a native of the Philippine Islands.
d. Must not be a permanent resident of the Philippine Islands.
When there is any question whatsoever concerning the eligibility of an employee, the case should be sent, with full details, to the Assistant Administrator for Personnel, through the Director, Insular and Foreign Eo-lations, for final decision.
Allowances authorised: Allowances paid to eligible VA employees in the Philippine Islands will be those established for this area by the Secretary of State and promulgated in Bureau of the Budget Circular No. A-8, as revised. These rates are subject to change. However, the rates herein set forth will be complied with until the Manager of the VA Eegional Office in the Philippine Islands is notified otherwise by the Central Office.
Beginning November 3,1946, the following cost of living allowances will be paid to all YA employees in the Philippine Islands who meet the eligibility requirements set forth above:
a. Eates:

Employees with

Dependents All Other Base Salary in the Area Employees

$5,905.20 and aboye_ $3,060 $2,520
$4,149.60 to $5,905.20_ 2,700 2,160
Below $4,149.60_ 2,520 1,980
b. Deductions:
The above rates shall be reduced (1) 40 percent where employees live in requisitioned or other Government quarters and are making no payments or payments at a rate not in excess of $2.00 a day for such quarters; (2) 20 percent where meals are obtained at no cost or at a cost not in excess of $1.50 a day from or through the military services or any other agency of the United States or Allied Governments.
*****
Method of computing allowances: * * *
b. The special foreign living allowance to an employee resigning, dismissed, retiring or transferred to another Federal agency or a YA establishment outside of the Philippine Islands shall terminate at the end of the last day he is on duty with YA in the Philippines. *****
f. The special foreign living allowance is not subject to income taxes, and is not to be considered as part of the employee’s salary for retirement purposes.
*230 9. The plaintiff was married and his wife lived with him while he was stationed in Manila.
10. When the payment to the plaintiff of the 25% differential was discontinued as of July 14,1946, the plaintiff and other employees similarly situated were promptly advised by the Manager, Regional Office, and requested to advise the Manager if they wished to be given the opportunity to return to the United States.
On August 6,1946, the plaintiff wrote the following letter to the Manager of the Manila Regional Office:
The ruling of Central Office in discontinuing payment of 25% differential to native born Filipinos, including those who became naturalized American citizens, sent to the Philippines from the United States is a serious blow to the means of supporting life in Manila.
I am a native born Filipino who became a naturalized American citizen while I was still performing my duties in the United States Navy.
I requested to be sent to the Philippines, among other things, from Central Office, on the inducement and strength of the 25% differential. Upon arriving in Manila I found out that living quarters were hardly available and if there is now any to be had, the rent is astoundingly high. Commodity prices are soaring to new heights wholly [i]n the absence of price control. However, the 25% differential was sufficient to counterbalance the excessively high cost of living. But the withdrawal of the 25% differential makes it awfully difficult for my wife and I to maintain even a fairly decent living with my base pay as the main source of sustenance. From experience after living for so many years in the United States, compared with that of a few months sojourn in Manila, my pay can tide us further and better in the United States.
On the basis of existing conditions in Manila, the loss of the 25% differential subverts our efforts to cope against overwhelming odds. I request, therefore, to be transferred to the United States, preferably in Washington, D. C., from where I was assigned to Manila. I am now performing the duties and responsibilities of a Budget Accounts Clerk in this Regional Office. I am willing to accept a position of the same grade in the Finance Division or in any other Division in Central Office which calls for similar training and qualifications.
*231 On February 3, 1947, tbe plaintiff addressed a further letter to tbe Acting Manager of tbe Manila Eegional Office calling to his attention tbe hardships caused by tbe discontinuance of tbe 25% differential and the non-payment to him of the foreign living allowance, and requesting a transfer to the Central Office of the Veterans’ Administration in Washington, D. C.
On March 19, the plaintiff addressed a further letter to the Personnel Officer at the Regional Office in Manila which, after discussing an enclosed application for Federal employment and the difficulties encountered by the plaintiff due to the discontinuance of the 25% pay differential and the withholding from him of the foreign living allowance, stated as follows:
5. When the 25% differential was discontinued entirely, the “Special Foreign Living Allowance” was put into effect. I was hoping, as a citizen of the United States, to benefit by this “special type of cost of living” allowance. Unfortunately, the benefit is not extended to me because I was born in the Philippines. But the fact that I was born in the Philippines does not, in any way, immune me from paying the high rental charges and soaring commodity prices to which every foreigner is subjected. The los[s] of the 25% differential impedes my continued and further sojourn in this area. And because I am excluded from established benefits extended to other American citizens working for the United States Government overseas, I request your prompt action to expedite my transfer to Central Office.
6. It is further requested that the government furnishes transportation for me and my wife, who accompanied me to Manila from Washington, D. C., and for an adopted child whom we will take along with us on our return to the United States. In the interest of economy on our part we will take back some of our household goods and personal effects that we brought with us from Washington, D. C. They will amount to not more than four thousand pounds.
7. I am ready to leave Manila with my dependents as soon as I can be released by my Division Chief and by this Office and as soon as it is convenient for the government to ship us to the United States.
8. I am willing to accept a position of the same grade and designation in the Finance Division or in any other Division in Central Office where my training and qualifications fit.
*232 Plaintiff received no other specific personal replies to his memoranda or letters, as a large number of employees were making similar claims or requests. Plaintiff had, however, been promptly advised of the reasons for the discontinuance of the 25% salary differential, that the special foreign living allowance would not be paid to him and employees in similar situations, and that his claim or appeal had not been allowed.
11. Effective June 1,194V, the Veterans’ Administrator replaced the special foreign living allowance in the Philippines with the cost of living allowance and living quarters allowance provided by the above-mentioned Bureau of the Budget Circular No. A-8, revised July 19,1946, Appendixes II and III, with eligibility requirements as provided in the Administrator’s instructions of November 5, 1946, above. For cost-of-living allowances, Class 9 was to govern. Class 9 allowances were $1,100 per annum in the salary range $2,000 to $2,999 for personnel with dependents. For quarters allowances, Class V applied with allowances of $900 per an-num (married, or unmarried with family) and $600 (if single and without family).
By Bureau of the Budget Bulletin dated August 22,1947, a 30% increase in the quarters allowance applicable to employees in the plaintiff’s salary range in Manila, P. I., was authorized effective July 1,1947. On January 22,1948, such quarters allowance was authorized retroactive to July 1,1947, by the Veterans’ Administration.
12. Under date of July 15,1947, the Administrator of Veterans’ Affairs wrote the Acting Manager of the Manila Regional Office as follows:
Reference is made to letters of appeal received from certain employees of the Manila Regional Office concerning the payment of the 25 percent differential above base pay and the special foreign living allowance.
A thorough review has been made of the eligibility requirements which became effective for the 25 percent differential on July 14, 1946, and those established for the special foreign living allowance which replaced the 25 percent differential, effective November 4, 1946. On the basis of this review, it has been determined that extra-continental allowances will not be approved for employees of the Manila Regional Office who are natives or permanent residents of the Philippine Islands.
*233 I am aware of the present high cost of living in the Philippine Islands. The difficult financial problems encountered by employees in that area, as a result of the prevailing inflationary conditions, are fully understood. This situation was given careful consideration in arriving at a decision on this matter. However, I feel that to approve payment to natives and permanent residents of the Philippine Islands would not be in accordance with the purposes for which the VA adopted the special foreign living allowance. This allowance was adopted for the purpose of compensating employees who leave, or remain away from, their native land, or who leave or remain away from their land of permanent residence and do not return to work in their native land, for the inconvenience and additional expense incurred by virtue of their employment in a foreign area. Under these circumstances, it is not possible to authorize payment of the allowance to natives or permanent residents of the Philippine Islands.
I would appreciate your transmitting this decision to all employees whose appeals have been submitted to the Central Office, or who have requested reassignment back to the United States because of their ineligibility for the 25 percent differential or the special foreign living allowance, so that individual replies will not be necessary. It is requested that employees who desire to be returned to the United States complete a current Standard Form 57, which should be forwarded to the Director, Foreign Eelations Service. This should be accompanied by a statement of work performance, including the current efficiency rating, completed and signed by the employee’s immediate supervisor, and countersigned by the Manager (or Acting Manager).
As you know, considerable difficulty is being experienced in locating suitable positions for employees returning from Manila to the United States at this time. However, every reasonable effort will be made to effect the reassignment of these employees and whenever possible the employee will be given reemployment fights in the branch area from which he was transferred.
I again want to express my appreciation for the loyal service rendered by the employees of the Manila Ee-gional Office. I hope that the YA may have the continued benefits of such service in the future.
The Veterans’ Administration made efforts to locate a position for plaintiff, but as he did not have Civil Service status this was difficult.
*234 Under date of November 3, 1947, the plaintiff wrote to the Manager of the Manila Office as follows:
1. Further reference is made of my basic request for transfer back to the United States because of the loss of payment of wage differential. It will be noted, that I submitted my application shortly after the 25% differential pay was discontinued and soon after Central Office indicated that it would consider the transfer and the return to the United States of employees who were affected by the ruling. In spite of the repeated endorsements and recommendations by this Office that my transfer be effected, Central Office has not, up to this time, handed out a favorable decision of my case.
2. I was made to understand that the delay in effecting my transfer is my lacking of competitive status. While it was also indicated that Central Office will take steps to help transferees in acquiring status,, it is my firm belief that a return at this time will, give me a better and an early opportunity in acquiring a competitive status. I cannot do this advantageously while I remain in Manila.
3. In studying the adopted policy and procedures governing transfers and placements of employees to the United States from Manila after the completion of their normal tour of duty, it is my understanding that there is no guarantee of being placed in suitable positions of those who have no competitive status. Such being the case, I would welcome a chance to be returned to the United States at this time.
4. I realize that I am asking for transfer sooner than the completion of the period of employment agreement. But it must also be realized that the payment of the 25% differential pay which is made a part thereof, has been revoked. Therefore, it is my feeling that it is in order to plead again that my request be given the utmost attention and careful reconsideration.
5. If my situation will not be improved because of lack of competitive status in qualifying for satisfactory placement after the completion of my tour of duty in five and a half months hence, it is earnestly requested that return and transportation back to Washington, D. C., be authorized at this time.
Shortly thereafter plaintiff’s return to the United States was authorized at Government expense, and a position was obtained for him in the Central Office in Washington in a lower grade but at the same salary.
*235 Plaintiff left the Manila Regional Office January 25, 1948, and arrived in the United States February 9, 1948.
13. Plaintiff submitted a claim to the General Accounting Office for special foreign living allowance during the period in question, and the claim was denied by that office.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that, as a matter of law, the plaintiff is entitled to recover, and it is adjudged and ordered that he recover of and from the United States two thousand nine hundred five dollars and seventy-two cents ($2,905.72).